**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Madelyn TORRES, Defendant–Appellant.**

No. 92–5246.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1995.

Decided Oct. 4, 1995.

Rehearing In Banc Granted; Opinion Vacated Nov. 13, 1995.

ARGUED: John Randolph Riley, Raleigh, NC, for appellant. David Bernard Smith, Assistant United States Attorney, Greensboro, NC, for appellee. ON BRIEF: Robert H. Edmunds, Jr., United States Attorney, Lisa B. Boggs, Assistant United States Attorney, Greensboro, NC, for appellee.

Before HALL and WILLIAMS, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Vacated and remanded by published opinion. Senior Judge PHILLIPS wrote the majority opinion, in which Judge HALL joined. Judge WILLIAMS wrote a dissenting opinion.

## OPINION

PHILLIPS, Senior Circuit Judge:

Madelyn Torres was convicted by a jury of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). On this appeal, she challenges only the district court's denial of her pre-trial motion to suppress evidence that she contends was obtained by an unconstitutional search. Because we conclude that the challenged evidence should have been suppressed, we vacate the conviction and remand for a new trial.

I

The relevant facts respecting the suppression issue, either undisputed or taken in the light most favorable to the government, are as follows.

On February 12, 1991, Alamance County Sheriff's Department Investigators J. Dean Ward and Ron Florence were conducting a routine drug interdiction investigation at the Burlington, North Carolina, train station. At approximately 6:55 p.m., Torres was the sole passenger to disembark from a train that had arrived from Raleigh. She carried a purse and a duffel bag. The officers approached her, identified themselves and their mission, and told her they would like to ask a few questions. She said, "I'll help you if I can."

According to Officer Ward, the officers told Torres repeatedly throughout the ensuing encounter that she was free to leave. They asked her for identification, and she produced a valid U.S. passport bearing her true name. They asked to see her tickets, and she produced two tickets, one dated February 4, 1991, bearing the name "Pattie Torres" and one dated February 12, 1991, bearing the name "M. Torres." She explained the discrepancy, saying "evidently the people made a mistake at Amtrak." Torres said she had travelled from New York to Burlington to spend a few days and to meet a friend named "Bookie," but she did not know Bookie's last name or address. When Ward dialed the telephone number she gave as Bookie's, he reached a hotel in Raleigh. Torres consented to a search of her person and her purse. Ward searched her purse and found nothing incriminating. The search of her person was delayed until a female officer later arrived. It likewise produced nothing incriminating.

Despite having consented to a search of her purse and her person, Torres refused to consent to a search of her duffel bag, telling Ward that he would have to obtain a search warrant. Because Ward was relatively inexperienced at train station drug interdiction,[1] he telephoned a more experienced agent of the U.S. Drug Enforcement Agency (DEA) for advice on how to proceed. After hearing about Torres's arrival from New York, the tickets with different names, and the fact that Torres had consented to search of her purse but not of her duffel bag, the DEA agent advised Ward to seize the bag and give Torres a receipt for it in order to allow it to be subjected to a "sniff test" by a dog trained to detect narcotics.

Ward did take custody of the bag and gave Torres a receipt. He also obtained from Torres a New York telephone number where she said he could reach her to return the bag. He suggested that she accompany him to the sheriff's department, explaining that if

1. Ward testified that he had been a vice and narcotics investigator for approximately twelve months at the time of the encounter with Torres and had conducted numerous investigations of drug violations in general, but had only conducted three train station drug interdictions.

the dog gave a positive response he would obtain a warrant and search the contents of the bag, but that if the dog gave a negative response she could take the bag and leave. Torres asked if she would be arrested if she did not go to the station. After Ward told her that she would not, she decided to go. Ward gave Torres a choice between riding to the station with him or with a female officer, and she chose the latter. Ward then sent for a female officer who arrived at approximately 7:50 p.m. The female officer performed a consensual pat-down search of Torres's body, and then drove her to the sheriff's department, allowing her to sit in the front seat of the sheriff's car rather than be restrained in the caged-in back seat.

At the sheriff's department, Torres was again advised that she was free to leave, and she was allowed to make several phone calls. At about 8:05, Ward called the Burlington Police Department to request their drug dog and handler and was told that the dog would not arrive until about 9:30 p.m. Torres was told of the reason for the delay and that she was still free to leave, but still she stayed. Ward notified the sheriff of the impending delay, and the sheriff produced a dog certified in narcotics detection by about 8:15 or 8:20.[2] The sheriff's dog immediately alerted to Torres's bag. At approximately 9:00, in Torres's presence, Ward told another officer of the sheriff's dog's positive response. Torres then consented to the search of her bag. Nevertheless, the officers waited for the police dog to arrive and sniff the bag. When that dog alerted to Torres's bag, Ward advised her that she was no longer free to leave. He used the dogs' positive responses as the basis to obtain a search warrant, which was issued at 10:35. A search of the bag then revealed more than 600 grams of cocaine base hidden among clothing.

Torres was charged with violating 21 U.S.C. § 841(a)(1). She moved pre-trial to suppress the evidence of the cocaine base found in the duffel bag, arguing that the encounter that preceded the search of the bag was an investigative detention which had not been justified by a reasonable, articulable

suspicion that the bag would contain illegal substances and thus was unconstitutional under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny; that the detention and subsequent search thus violated the fourth amendment; and that, therefore, all evidence obtained as a result must be excluded or suppressed. After an evidentiary hearing, the district court denied the motion in open court, stating simply that

> I don't believe there is ample information or evidence in the record to warrant suppressing the—to allow your Motion to Suppress. I just don't see how that could possibly be done on the facts in this case. And then you have the further question of whether or not, if the stop was improper and the bag was taken as described, was that unreasonable; and the Court does not believe this was a violation of the Fourth Amendment.

J.A. 72.

Torres was ultimately convicted of possession with intent to distribute cocaine base at a jury trial in which the discovery of cocaine base in her duffel bag was of course critical evidence. This appeal followed, with Torres challenging the denial of her suppression motion.

## II

 Torres does not challenge the constitutionality of the officers' initial confrontation in which they sought her consent to answer a few questions. She further concedes that the ensuing search of her purse and of her person were consensual. She therefore concedes that the encounter was consensual up to the point that she refused to consent to a search of her duffel bag. She contends, however, that her refusal at that point should have ended the encounter and that the agents were unjustified in thereafter detaining her and seizing her luggage. The government, in contrast, contends that the agents had a reasonable suspicion, supported by articulable facts, that she was engaged in criminal activity, and that this suspicion was sufficient to justify the ensuing investigative

---

**2.** Apparently this dog, although certified and experienced, had not been the officers' first choice because it was used primarily for demonstrations.

detention of her bag under *Terry*. Torres also argues that, even if the initial seizure of her bag was justified, the length of the detention rendered the seizure unconstitutional, while the government contends that the seizure was not invalidated by its length because it lasted no longer than was justified by the circumstances. Because we agree that the investigative detention of the bag was not supported by a reasonable suspicion, we conclude that it was unjustified no matter how brief. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (An individual "may not be detained *even momentarily* without reasonable, objective grounds for doing so.") (emphasis added). We need not, therefore, reach Torres's alternative objection to the temporal length of the bag's detention.

■ A "consensual encounter can develop into an investigatory detention as a consequence of police behavior." *United States v. Withers*, 972 F.2d 837, 842 (7th Cir.1992) (consensual encounter ripened into an investigative stop when officer informed traveller that officer was detaining his luggage for a canine sniff); *see also INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 393, 126 L.Ed.2d 342 (1993). Here, when Torres refused to consent to the search of her duffel bag, the officers informed her that they were seizing her bag to subject it to inspection by a dog trained to detect narcotics. Detention of a traveller's luggage, as here for a canine sniff, implicates his fourth amendment rights "to the same extent as if the detention were of [his] person," *McFarley*, 991 F.2d at 1192, and is subject to the same limitations applicable to an investigative detention of his person on less than probable cause. *United States v. Place*, 462 U.S. 696, 708–09, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983). The encounter between Torres and the officers thus turned into an investigative detention of her luggage.

■ An investigative detention is a limited detention, more intrusive than a consensual encounter between a police officer and a citizen but less intrusive than an outright arrest. *E.g., Terry*, 392 U.S. at 26, 88 S.Ct. at 1882–83; *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied*, 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). It "must be 'supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982) (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (per curiam)). The "suspicion must be more than an 'inchoate and unparticularized suspicion or "hunch,"'" *id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883), and must be based upon specific, articulable facts sufficient to give rise to a reasonable suspicion that criminal activity is afoot. *Johnson*, 910 F.2d at 1508. Moreover, "due weight must be given ... to the specific reasonable inferences" that the officer "is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

■ In the absence of specific findings of fact by the district court, we must uphold its denial of Torres's motion to suppress "if any reasonable view of the evidence, looked at in the light most favorable to the government, will sustain the denial." *United States v. Bethea*, 598 F.2d 331, 333–34 (4th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979). We conclude that here, on the evidence adduced during the suppression hearing and at trial, viewed in the light most favorable to the government, the standard was not met and the district court erred as a matter of law in concluding that it was.

"A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion...." *United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989). Here, in the suppression hearing before the district court, the government identified the following factors as those that supported Investigator Ward's suspicion: (1) the two train tickets, one bearing the incorrect name "Pattie Torres;" (2) the fact that Torres was travelling from New York, a "source city;" and (3) the fact that Torres claimed to be visiting a person named "Bookie" whose last name or address she did not know and whose alleged phone number

was a hotel in a city through which she had already travelled. On appeal, the government confirmed that these were the facts upon which it relied at the suppression hearing to support the officers' reasonable suspicion to engage in an investigative stop and to search Torres's duffel bag without her consent. Appellee's Br. 11–12, 17.

In its brief, the government also alludes to several other facts as support for the conclusion that the agents harbored a reasonable suspicion, specifically (4) that Torres claimed that she had been asleep during most of the train ride from New York and (5) that Torres had paid for the tickets with cash. *Id.* No support for these additional factors was presented to the district court during the suppression hearing and that court therefore could not have considered them in its pre-trial determination whether to suppress the evidence. Because, however, supporting evidence for these additional factors was later adduced at trial, (Trans. of Trial on 4/8/91, at 52–53, 56–57), we must count them in the balance in assessing the suppression issue. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *Washington v. United States,* 401 F.2d 915, 919 n.19 (D.C.Cir.1968); 3 Charles A. Wright, *Federal Practice and Procedure* § 678, at 805 & n.23 (2d ed. 1982 & Supp. 1995).

Although some of the five factors ultimately relied upon by the government may be said to be part of a typical "drug courier profile," "a drug courier profile, without more, does not create a reasonable and articulable suspicion." *Gooding,* 695 F.2d at 83. Moreover, several of the factors provide little, if any support. The first is easily explained in that the incorrect name on the one ticket, "Pattie," sounds similar to "Mattie," a nickname for Madelyn, and might have been inadvertently substituted by a ticket agent who did not hear Torres correctly

when she gave her name.[3] Moreover, the ticket bore the correct surname, making implausible any suspicion that Torres was travelling under an alias or that an agent would be misled by the variance. *Compare Royer,* 460 U.S. at 494, 502, 103 S.Ct. at 1322, 1326–27 (fact that Royer's airline ticket bore the surname "Holt" while his driver's license bore the surname "Royer" and fact that he personally attached identification tags bearing the name "Holt" on his luggage were sufficient to show that he was travelling under an assumed name and to raise reasonable suspicion).

The second, fourth, and fifth factors, viewed either separately or in combination, "describe a very large category of presumably innocent travellers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754; *see also Gooding,* 695 F.2d at 83. In particular, we note that as a general proposition paying in cash for a train ticket for a trip of the length of this one is not inherently suspicious conduct, as might be paying in cash for an airline ticket for a trip of the same length. *Cf. United States v. Alpert,* 816 F.2d 958, 961 (4th Cir.1987) (cash payment for air-fare, with other factors, sufficient to create reasonable suspicion). Only the third factor, Torres's ignorance of Bookie's name and address, might be considered somehow suggestive, because of its seeming evasiveness, of criminal intent or conduct, but we cannot think it more than that—certainly not as sufficient, either alone or as the balance-tipping factor, to support a reasonable suspicion that Torres was then committing a crime.

So flimsy do the cited factors appear upon reflection that we are driven to suppose that something more (if not mere risk-free hunch,[4] which cannot serve merely because it

---

**3.** Torres testified at trial that Mattie was her nickname and that she told the ticket agent that her name was Mattie Torres. Trans. of Trial on 4/8/91, at 88–89.

**4.** The government cites no factors to support its claim of a "reasonable, articulable suspicion" that were known to the officers before they initi-

ated the encounter with Torres. All the information cited as suspicious was revealed by Torres voluntarily during the consensual part of the encounter. To the extent the initial encounter itself is sought to be explained as an allowable "random" one, it suffers from the fact that Torres was the only passenger who got off this particular train.

succeeded) was at work here. What that critical "more" may well have been is strongly suggested by various matters of record. It is the fact that, having consented to a search of her purse and person, Torres changed course when attention turned to her duffel bag and at that point "stood on her rights." Officer Ward identified this as a critical factor in his suppression hearing testimony.[5] The government alluded to it in its suppression hearing argument, J.A. 68–70, and again in its oral argument on this appeal.

As the Government candidly conceded on oral argument in this court, however, this is not a factor that properly may figure in the creation of a reasonable suspicion to detain, for any period of time. Officers cannot use a traveller's "refusal to consent to the search of his bags as support for the requisite reasonable, articulable suspicion." *United States v. White*, 890 F.2d 1413, 1417 n.4 (8th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). *See also Royer*, 460 U.S. at 498, 103 S.Ct. at 1324 (person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds."); *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *United States v. Manuel*, 992 F.2d 272, 274 (10th Cir.1993) ("[T]he exercise of a right to refuse consent alone cannot be the basis of the basis of reasonable suspicion."); *United States v. Wilson*, 953 F.2d 116, 126 (4th Cir.1991) (noting in *dicta* that a refusal to consent to a police search cannot support a reasonable suspicion to justify an investigative stop or seizure); *United States v. Nunley*, 873 F.2d 182, 185 n.4 (8th Cir.1989) ("Refusal to listen to or answer [inquiries by an officer] would not furnish the basis for detention....").

When it is recalled that no prior suspicion attached to Torres before the blind encounter initiated by the officers at the train station, and when her action in standing on her rights is factored out of the assessment, what remains does not suffice to support the district court's finding that the original detention of her luggage was based upon a reasonable suspicion of criminal conduct. As a result, the later search and seizure based upon probable cause derived from information gained during the unconstitutional detention was also illegal, and the evidence so obtained was tainted. *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir.1993) ("Evidence seized as a result of an illegal stop is subject to the fruit of the poisonous tree doctrine."); *Gooding*, 695 F.2d at 84 (illegal seizure tainted ensuing search and its fruits).

This conclusion is not affected by the fact that Torres eventually consented to the search of the bag. *Cf. Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) ("A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid."). Here the eventual consent by Torres was not freely and voluntarily given but was instead given in acquiescence to the apparent lawful authority of the agents to search her bag once she knew that the drug dog had alerted to the bag. *See id.*, 391 U.S. at 548–49, 88 S.Ct. at 1791–92.

In sum, the fact that the agents' actions here fortuitously produced evidence of a crime—the cocaine base discovered in Torres's bag—does not vitiate the fact that their actions violated Torres's Fourth Amendment rights. As we said in *Gooding*,

Though the constitutional requirement of a "reasonable articulable suspicion" for police investigative seizures has come justifiably to be a lenient one in the context of this type of case, it nevertheless protects a precious right—hard earned and easily lost—to be free of arbitrary police intru-

---

5. "I called [the DEA agent] ... and I just advised him of the articulable facts that we had—advised him that she had consented to a search of one bag and she stated to me that I would need a search warrant for her other bag; and that's when he told me to seize the gym bag...." J.A. 45.

sions on individual privacy and free movement. There is a line, dim though it be, and we are satisfied that here it was crossed. On the objective criteria articulated by the police for the detention of this citizen, we conclude that his seizure was impermissible under the fourth amendment.

695 F.2d at 84 (citations omitted).

Because Torres's conviction was obtained by the use of illegally seized evidence, we therefore vacate the judgment and remand for a new trial if the government would reprosecute.

*VACATED AND REMANDED.*

WILLIAMS, Circuit Judge, dissenting:

Because I believe that the temporary detention of Torres's duffel bag was fully supported by a reasonable, articulable suspicion of criminal activity, I must respectfully dissent.

The determination of whether a reasonable, articulable suspicion exists to support a limited detention of an individual's luggage employs a common sense approach. *See United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). The court must consider "the totality of the circumstances—the whole picture," weighing the evidence "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). That the facts supporting the reasonable, articulable suspicion, taken singly, do not support an inference of criminal activity is of little or no consequence; the relevant question is whether what the law enforcement officers observed, taken as a whole and including any reasonable inferences therefrom, gives rise to a reasonable, articulable suspicion of criminal activity. *See United States v. Colyer,* 878 F.2d 469, 480 (D.C.Cir.1989).

Here, the decision to detain Torres's luggage was supported by eight factors: (1) Torres had departed from New York City, a "source city" for narcotics, *see United States v. McFarley,* 991 F.2d 1188, 1192 (4th Cir.)

(finding arrival from known "source city" to be a factor supporting reasonable, articulable suspicion for detention of luggage), *cert. denied,* —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 342 (1993); (2) she was travelling all the way from New York City to Burlington, North Carolina, without knowing anyone in Burlington other than an individual nicknamed "Bookie"; (3) she was instructed to call a non-local phone number when she arrived in Burlington that proved to be listed to a hotel in Raleigh, North Carolina, a city through which she had already passed; (4) Torres became defensive and claimed that she had been asleep during the entire trip from New York City to Burlington when the investigators asked for permission to search the duffel bag, *see id.* (finding nervousness when speaking to law enforcement officers to be a factor supporting reasonable, articulable suspicion); (5) she stated that she was staying in Burlington only "a couple of days"; (6) she did not know "Bookie's" surname or address; (7) she paid cash for her tickets; and (8) she was in possession of two tickets issued in different names. Taken together, these facts clearly established the "minimal level of objective justification" required to support the investigative detention of Torres's bag. *See INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). Accordingly, I must dissent.[*]

---

[*] In addition, I would conclude that Torres's bag was not detained for an unreasonably long period of time. *See United States v. Alpert,* 816 F.2d 958, 961–63 (4th Cir.1987).