UNITED STATES of America

v.

Fletcher Edward BANKS, Defendant.

Criminal Action No. 97–138–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 14, 1997.

Helen F. Fahey, U.S. Atty., Gavin Corn, Special Asst. U.S. Atty., Alexandria, VA, for U.S.

Matthew Wartel, Alexandria, VA, for Fletcher Edward Banks.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this case, a Virginia State Trooper stopped a vehicle because he suspected its driver was either dangerously fatigued or intoxicated. Following the driver's successful performance of a field sobriety test, the State Trooper then questioned him about whether the vehicle contained any illegal contraband. To the Trooper's surprise, the driver admitted that he had narcotics in the vehicle. This admission triggered a search that confirmed the presence of drugs in the vehicle and led to the driver's arrest and indictment. Thereafter, the driver filed a pretrial suppression motion, which presents the question whether the State Trooper's inquiry on a subject unrelated to the initial reason for the stop was supported by an articulable, reasonable suspicion that illegal drug activity was afoot.

**I**

The pertinent facts are essentially undisputed. While patrolling Interstate 95 on the morning of June 6, 1996 in an unmarked cruiser, Virginia State Police Senior Trooper Mark Wilkinson observed a vehicle traveling 5 to 7 miles slower than the posted speed limit of 65 mph and weaving to the right of its lane. Trooper Wilkinson had initially planned to pass the vehicle on his way to respond to a stranded motorist call. Instead, he elected to slow down and to follow the vehicle briefly. While doing so for about three tenths of a mile, he noticed that the vehicle was weaving within its lane, that other automobiles were passing him, and that the driver appeared to be adjusting the vehicle's radio. As a twenty year veteran of the Virginia State Police, Trooper Wilkinson suspected that the driver, defendant Fletcher Edward Banks, Jr., was either dangerously fatigued or intoxicated. Accordingly, he pulled the vehicle over to the right shoulder of the highway. Safety concerns prompted Trooper Wilkinson to approach the vehicle on foot on the passenger side. There, he asked Banks for his license and registration. In response, Banks handed Trooper Wilkinson his license and the vehicle's rental agreement. While standing there, Trooper Wilkinson noticed two small bags in plain view—an overnight bag on the back seat and a bag on the floor behind the driver's seat. He also noted the vehicle's North Carolina tags.

Trooper Wilkinson then inquired about Banks' travel plans. Banks stated that he had left New York City and was returning to Charlottesville, Virginia. Next, Trooper Wilkinson informed Banks that he had been stopped for suspicion of driving while fatigued or under the influence and requested that he exit the rented vehicle. Banks complied. Trooper Wilkinson proceeded to ask Banks a few more routine questions. In response, Banks told Trooper Wilkinson that he resided in Charlottesville, was employed by McDonalds, and had worked the previous day's shift. After finishing his shift in the afternoon, Banks rented the vehicle, drove to New York City, spent only a few hours there, and was returning home when stopped. This narrative heightened Trooper Wilkinson's

suspicion that Banks was fatigued, for it clearly indicated that Banks had been awake for at least 24 hours. Although Trooper Wilkinson detected no odor of alcohol, he ordered Banks to stand on one leg as part of a field sobriety test. Since Banks adequately performed this task, Trooper Wilkinson concluded that Banks was not inebriated and administered no further sobriety tests. Yet, based on his eight years of experience as a narcotics canine handler and the facts and circumstances he then knew, Trooper Wilkinson also suspected that Banks might be transporting illegal narcotics.[1]

At this point, while he retained Banks' license and rental agreement, Trooper Wilkinson queried Banks about the contents of his vehicle. Specifically, Trooper Wilkinson asked Banks if he was concealing any illegal contraband. Banks answered "no." Although Banks was polite and cooperative, Trooper Wilkinson noticed that Banks' demeanor had changed somewhat when he mentioned the topic of unlawful drugs. Banks became unusually and visibly nervous, trembling slightly and glancing for the first time at his rented automobile. So Trooper Wilkinson persisted in this line of questioning, asking Banks a second time whether the rental vehicle contained hidden contraband. To Trooper Wilkinson's apparent surprise, Banks responded "yes" and volunteered that there were drugs in the bag behind the driver's seat. Up to this point, the traffic stop had lasted no more than five minutes.

Next, Trooper Wilkinson undertook to search the vehicle and to retrieve the bag he had seen. To ensure his safety in doing so,

he directed Banks to walk 75–100 feet away from the rental vehicle. As he searched Banks' vehicle for the bag, Trooper Wilkinson noticed Banks running in his direction. He immediately exited the automobile, drew his service revolver, and held Banks at gunpoint. After ordering Banks to the ground, Trooper Wilkinson radioed for assistance. When assistance arrived, Banks was handcuffed and the rental vehicle was searched. In the course of the search, Trooper Wilkinson located a plastic bag, opened it, and found a white rock-like substance, which he believed (and tests later confirmed) was crack cocaine.

The Commonwealth of Virginia charged Banks with felony possession with intent to distribute cocaine, in violation of Va.Code § 18.2–248. At the preliminary hearing in the Prince William County General District Court, Banks' motion to suppress was granted on the ground that Trooper Wilkinson had lacked a sufficient basis to execute the traffic stop in the circumstances. The Commonwealth did not seek reconsideration of that ruling, the case was dismissed, and no appeal was pursued.

Then, in March 1997, a federal grand jury returned a one count indictment charging Banks with possession with intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Banks filed pretrial motions to suppress evidence and statements related to his arrest by Trooper Wilkinson and to dismiss the indictment for prosecutorial misconduct and collateral estoppel. Oral argument on the motions was heard on June 6, 1997, after which both of Bank's motions were denied. *United States v. Banks*, Crim. No. 97–138–A (Order, June 9, 1997).[2] Subsequently, on June 11,

---

1. According to Trooper Wilkinson's testimony of July 3, 1997, Banks' statements caused him to doubt the avowed purpose of Banks' visit to New York City. Specifically, Trooper Wilkinson cited a number of separate factors that piqued his curiosity about Banks' trip: (1) the fact that he used Interstate 95, a major drug smuggling corridor; (2) the fact that he drove all night to New York City, a major source city for illegal narcotics, and stayed for such a brief time; and (3) the fact that drug smugglers typically use rental cars to avoid losses due to civil forfeiture.

2. Banks' motion to dismiss the indictment was denied because: (1) the dismissal of the state case was not binding on the United States, a separate sovereign; and (2) the successive federal prosecution was not vindictive or oppressive in the circumstances. *See Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (holding that the United States, as a separate sovereign, has the authority to prosecute a defendant for conduct which is also a crime under state law); *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (limiting application of the presumption of prose-

1997, Banks filed a motion for reconsideration of the Court's ruling on his motion to suppress. On June 16, 1997, the Court heard oral argument, took the motion under advisement, directed the parties to submit supplemental briefs, and scheduled additional oral argument for Thursday July 3, 1997. *United States v. Banks*, Crim. No. 97–181–A (Order June 16, 1997). The parties complied and the Court denied Banks' motion for reconsideration for the reasons stated from the bench pursuant to Rule 12, Fed.R. Crim.P. *United States v. Banks*, C.A. No. 96–345–a (Order, July 3, 1997). This Memorandum Opinion further elaborates the reasons for the ruling.

## II

In his motion to suppress, Banks contends that Trooper Wilkinson's questions about drugs exceeded the scope of the traffic stop and, thus, converted the encounter into an unlawful detention. Specifically, Banks argues that Trooper Wilkinson's questions pertaining to illegal contraband violated the Fourth Amendment because he had no articulable, reasonable suspicion of drug activity. The government counters that Trooper Wilkinson's inquiry about drugs concealed in the vehicle was supported by objective facts and that, as a consequence, the search and seizure were valid.

 The principles dispositive of this dispute are well-established. In *Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court recently confirmed that probable cause to believe that a routine automobile violation has occurred justifies a traffic stop. As a general rule, an ordinary traffic stop constitutes a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). But since a traffic stop is a limited seizure, more akin to an investigative detention than a custodial arrest, the reasonableness of such a stop is assessed under the precepts of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984); *United States v. Rusher*, 966 F.2d 868, 875

(4th Cir.), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Specifically, *Terry* commands that a police officer have a reasonable suspicion, based on articulable facts, that criminal activity is afoot. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884–85; *see also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987). The quantum of articulable, reasonable suspicion required, however, is less than that required for probable cause. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310–11, 87 L.Ed.2d 381 (1985)). Courts assessing the validity of a *Terry* "stop," like courts assessing probable cause, must consider "the totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). And significantly, the "totality of the circumstances" may be based entirely on lawful conduct, for a combination of potentially innocent factors can alert the trained eyes of a police officer to illegal activity. *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586; *Davis v. United States*, 409 F.2d 458, 460 (D.C.Cir.), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969).

 A *Terry* stop not only "must be justified at its inception," but it also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879; *United States v. Lattimore*, 87 F.3d 647, 652 (4th Cir.1996). Put another way, a *Terry* stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Questioning within the scope of a *Terry* stop does not require *Miranda* warnings. *Berkemer*, 468 U.S. at 439–40, 104 S.Ct. at 3149–50; *United States v. Leshuk*, 65 F.3d 1105, 1110 (4th Cir.1995). In the context of a traffic offense, a detention may properly continue until the officer has obtained the driver's license and registration,

cutorial vindictiveness to cases "in which a rea-

sonable likelihood of vindictiveness exists").

performed the standard computer check, and explained the nature of the warning or ticket. *Rusher,* 966 F.2d at 876. Once this process is completed, there is no further justification for the stop and it must end promptly. *Royer,* 460 U.S. at 498–499, 103 S.Ct. at 1324–25; *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580–2581, 45 L.Ed.2d 607 (1975). If, however, during the check of a driver's license and registration, a police officer develops reasonable suspicion of drug crimes or other illegal activity, he may continue the detention to investigate that newfound suspicion. *United States v. Jeffus,* 22 F.3d 554, 557 (4th Cir.1994). Precisely this occurred here.

■ To begin with, the initial stop was plainly proper; Trooper Wilkinson had the requisite reasonable suspicion to stop Banks to investigate for fatigue or intoxication in the first place. He observed Banks' vehicle traveling slower than the posted speed limit and weaving within its own lane, both possible signs of intoxication or extreme fatigue and both valid bases for a traffic stop.[3]

■ But this does not end the analysis because Banks contends that Trooper Wilkinson's persistent questioning concerning whether his rented vehicle contained any illegal contraband exceeded the scope of the traffic stop and, hence, transformed the detention into a custodial interrogation. And this would be true were it not the case that Trooper Wilkinson became aware of facts and circumstances in the course of the traffic stop that provided him with an objective basis for a reasonable, articulable suspicion that Banks might be transporting illegal drugs in his rented vehicle. Principally, Banks admitted to Trooper Wilkinson that he had worked a full shift at McDonalds the previous day, had rented the vehicle to drive to New York City, and had visited friends there only for a few hours before returning to Virginia. These facts prompted Trooper Wilkinson to suspect that Bank's trip to New York City was not for a proper purpose. In short, Bank's brief nighttime visit in a rented automobile to New York, a well-known source city, after working a full shift at his

job gave rise to a reasonable suspicion of illegal drug trafficking.

Banks counters that the factors on which Trooper Wilkinson relied provide no objective support for such a suspicion because they merely parrot the generic "drug courier profile" and, thus, would presumably fit many, if not most, otherwise innocent travelers. *See Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (stating that the general characteristics of a so-called "drug courier profile" "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure"); *United States v. Torres,* 65 F.3d 1241, 1246 (4th Cir.1995) (holding that while "some of the five factors ultimately relied upon by the government may be said to be part of a typical 'drug courier profile,' a 'drug courier profile,' without more, does not create a reasonable and articulable suspicion"), *vacated,* 77 F.3d 91 (4th Cir.1996) (affirming the district court's denial of defendant's motion to suppress). To underscore this point, Banks isolates each factor on which Trooper Wilkinson relied and argues that, standing alone, it warrants no inference of drug trafficking. Thus, for example, Banks contends that the use of a rental vehicle to travel to and from a source city is not inherently suspicious. *See, e.g., United States v. Gooding,* 695 F.2d 78, 83 (4th Cir.1982) (holding that the defendant's travel from a source city, combined with his nervousness, was insufficient to support the officer's reasonable suspicion of narcotics activity); *United States v. Wood,* 106 F.3d 942, 947 (10th Cir.1997) (finding that the defendant's use of a rental car was not inherently suspicious). Yet, this contention is unpersuasive here; it is not whether individual facts or circumstances or even discrete sets of them reasonably invite suspicion; it is whether the totality of the circumstances do so. *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694–95. While a trip to New York City in a rented automobile, standing alone, does not provide cause for reasonable suspicion, few citizens

---

**3.** *See* Va.Code § 18.2–266 (driving while intoxicated or under the influence of alcohol); Va. Code § 46.2–812 (driving on a highway for more than 13 hours in a 24 hour period).

would drive 800 miles round-trip after a hard day of work merely to spend two or three hours with friends. That some of the factors underlying Trooper Wilkinson's reasonable suspicion comprise part of a "drug courier profile" does not negate their import in the circumstances;[4] Trooper Wilkinson had ample basis reasonably to believe that Banks was engaged in transporting drugs. Given this, Trooper Wilkinson's questioning of Banks fell squarely within the dictates of *Terry.* Accordingly, the motion to suppress must be denied.

An appropriate Order has issued.

---

**4.** As the Supreme Court explained in *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the mere coincidence that a defendant's behavior fits the classic aspects of a drug courier profile is often immaterial:

We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's "drug courier profiles." a court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent.

*Id.* at 10, 109 S.Ct. at 1587.